IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| NILESH SHAH, | : | Case No. 1:22-cv-312 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| FORTIVE CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |

**ORDER DENYING MOTION FOR
TEMPORARY RESTRAINING ORDER (Doc. 6)**

This case is before the Court on Plaintiff Nilesh Shah's motion for temporary restraining order (Doc. 6). Parties have briefed the motion and the Court has held an evidentiary hearing. For the reasons explained below, the Court **DENIES** Shah's motion for temporary restraining order.

## FACTS

Plaintiff Nilesh Shah is a naturalized United States citizen and Ohio resident who worked for Defendants as Vice President of International Sales and Service. Defendants Advanced Sterilization Products, Inc., and Advanced Sterilization Products Services, Inc. (collectively, "ASP") provide infection prevention products and solutions to healthcare facilities. (Complaint, Doc. 1, ¶ 8-10.) Defendant Fortive Corporation is an industrial growth company that wholly owns ASP. (*Id.* at ¶ 7, 10.)

Shah claims that, in contradiction of the contractual terms, Defendants failed to

pay his 2021 and 2022 Singaporean tax obligations. Now, he claims, he faces dire consequences for non-payment of his Singapore taxes, including penalties, freezing of his bank accounts, seizure of his assets, and imprisonment. (*Id.* at ¶ 36.) He seeks an injunction ordering Defendants to pay all of his Singapore tax obligations for 2021 and 2022 incurred through his employment with Defendant; to reimburse him for his 2019 Singapore taxes; and to cease demands that he repay them a portion of the Singapore taxes Defendants paid in connection with his employment in 2020.

The parties' relationship began in February 2019, when Shah received and accepted an offer of employment. (Doc. 1-1, Pg. ID 15.) He assumed the role of Vice President of International Sales and Service, located in Cincinnati, Ohio, on expat assignment to Singapore. (*Id.*) He received a base salary of $353,000 annually. Among other provisions, the offer contained the following expat allowance: "The company will also pay for tax assistance while on assignment in Singapore which includes Singapore tax obligations and tax filing assistance in Singapore." (Compl. Ex. A, Doc. 1-1, Pg. ID 16.) He began work in May 2019. (Compl., Doc. 1, ¶ 13.) Two years later, Shah received an offer to extend his employment with Defendants. He was promoted to VP/GM Commercial and his base salary increased to $385,000 annually. The extension offer contained the same expat allowance: "The company will also continue to pay for tax assistance while on assignment in Singapore which includes Singapore tax obligations and tax filing assistance in Singapore." (Compl. Ex. B, Doc. 1-2, Pg. ID 19.)

In February 2022, Shah exchanged emails with a representative at KPMG, Defendants' accounting firm. (Compl., Doc. 1, ¶ 23; Shah Decl. Ex. 4, Doc. 9-4, Pg. ID 78.)

2

The KPMG accountant advised Shah that he had spoken with ASP regarding his employment contract and taxes. Based on the language of the contract, according to the accountant, it was ASP's belief that they agreed to cover Shah's Singapore tax and all U.S. tax, after accounting for the foreign earned income exclusion and foreign tax credit that was Shah's responsibility. This meant that for 2020, Shah would not owe ASP anything related to 2020 taxes. And, for 2019, ASP would owe Shah the Singapore tax he covered on the ASP portion of the 2019 Singapore tax liability. (Shah Decl., Doc. 9-4, Pg. ID 78.)

On March 3, 2022, Aisha Barry, President of ASP, met with Shah and directed him to make plans to leave Singapore and return to the United States because of significant underperformance under Shah's direction. (Barry Decl., Doc. 8-1, ¶ 4.) He emailed her the next day confirming that he was "committed to be in [a] location that has significant revenue size and critical to success of ASP business and not Singapore." (Barry Decl. Ex. A, Doc. 8-1, Pg. ID 68.) Later, on March 16, Barry and Tiffany Zakszeski, Vice Present of Human Resources for ASP, met with Shah in California. They informed him he was being terminated for reasons that included his performance. (*Id.* at ¶ 8.) Shah still had a residence in Singapore, and went there after being terminated. (Doc. 10, Pg. ID 85.)

While in Singapore, Shah received from the Inland Revenue Authority of Singapore (IRAS) — Singapore's tax authority — an Income Tax Bill Overview dated May 13, 2022. This notice directed him to pay $218,167.74 within seven days from the date of the notice or before he left Singapore, whichever was earlier. (Shah Decl. Ex. 1, Pg. ID 74.) He also received a Notice of Assessment, stating that he had a payable tax of $41,959.40. This second communication notified him of a process for objecting to the

3

assessment. But it also stated that he was "required to pay any outstanding tax, even if you object to the assessment." (*Id.* at Ex. 2, Pg. ID 75.)

At the hearing, Shah testified that, after he received these notices, two extensions of the original deadline followed. The first was obtained by ASP. The second extension—granting him up to June 20, the operative deadline—was obtained by Shah. Shah testified, however, that the June 20 extension was given orally over the phone and without any documentary support. He further testified regarding the penalties for not paying the unpaid tax by that date: an automatic 5% penalty and repeating 1% increases until it was paid. The IRAS representative further told him that he "could" face travel restrictions. Shah testified that he would have to essentially empty his bank account to pay the unpaid tax. In his telling, the IRAS would do whatever they could to get money.

Because of the outstanding tax, he did not want to risk traveling abroad. This meant he did not attend his sister-in-law's funeral in person or visit his elderly father in India. (He did however attend the funeral over Zoom.) When asked if he received any kind of certificate from the Singapore Comptroller laying out the particulars of the unpaid tax and directing an enforcement authority to prevent him from leaving Singapore, he answered that he was not aware of receiving such a certificate. *See* Singapore Income Tax Act of 1947, § 86. He was also asked if he had been threatened with arrest or prison. He answered, "At this point, no."

At the conclusion of the hearing, the parties gave closing arguments and counsel for Shah requested injunctive relief in the form an order for Defendants to pay Shah's outstanding tax liability.

**ANALYSIS**

Federal Rule of Civil Procedure 65 empowers the Court to issue a preliminary injunction or temporary restraining order against an adverse party. Fed. R. Civ. P. 65(a), (b). In considering a request for injunctive relief, a court considers "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Ohio v. Becerra*, No. 21-4235, 2022 WL 413680, at *2 (6th Cir. Feb. 8, 2022) (quoting *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)). The standard for issuing a temporary restraining order is logically the same as for a preliminary injunction, but with emphasis on irreparable harm. *ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 219 F. Supp. 3d 665, 670 (S.D. Ohio 2016). The individual seeking injunctive relief bears the burden of proving that circumstances "clearly demand" the injunction. *Becerra*, 2022 WL 413680, at *2 (quoting *Overstreet*, 305 F.3d at 573).

Though this analysis involves balancing multiple factors, "the *existence* of an irreparable injury is mandatory." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) (emphasis in original). The irreparable harm factor is indispensable. *Id.* ("If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit."). Not only that, but the alleged injury "'must be both certain and immediate,' not 'speculative or theoretical.'" *Becerra*, 2022 WL 413680, at *2 (quoting *D.T.*, 942 F.3d at 927). The possible availability of sufficient compensatory

5

or other corrective relief, later in the ordinary course of litigation, heavily weighs against a finding of irreparable harm. *Id.* (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)). Moreover, when a party is seeking an order mandating affirmative action through the requested injunctive relief, the burden is heightened. *Shelby Cnty. Advocs. for Valid Elections v. Hargett*, 348 F. Supp. 3d 764, 769 (W.D. Tenn. 2018) ("a TRO tantamount to a mandatory injunction requires a higher—yet undefined—burden to issue than required of an order merely preserving the status quo").

On this record, Shah cannot carry his heightened burden to prove his entitlement to a temporary restraining order because he cannot establish irreparable harm. He primarily argues that, should the Court not affirmatively order Defendants to pay his tax obligation on its due date of June 20, 2022, then he cannot leave Singapore and faces immediate arrest and imprisonment. Neither the law nor the testimony support this argument.

Contrary to Shah's argument, Singapore law does not provide for imprisonment or arrest for failure to timely pay taxes. To the contrary, the Income Tax Act of 1947 expressly provides that, if taxes are not timely paid, certain penalties and interest will be assessed. *See* § 87(1). Shah admitted that this is what the IRAS representative advised him. Further, Singapore's Income Tax Act provides that the Comptroller may file a lawsuit to recover unpaid taxes. *See* § 89(1)-(8). But nowhere does it provide that a person may be arrested or imprisoned for failing to pay taxes. Indeed, despite extensive claims of imprisonment in his motion, Shah admitted at the hearing that he knew of no threat or indication that he actually faced arrest or imprisonment.

The only section that alludes to arrest or imprisonment is Section 86, entitled "Recovery of tax from persons leaving Singapore." Income Tax Act of 1947, § 86. Pursuant to this Section, if the "Comptroller is of the opinion that any person [owing taxes] is about or likely to leave" Singapore without paying taxes, he may "issue a certificate" outlining the tax owed and directing the police or immigration authority to prevent the person from leaving Singapore until payment has been made or otherwise secured. *See* § 86(1). The Section authorizes "use of such force as may be necessary, and if appropriate, the detention of any passport" or other travel documents necessary to leave Singapore. *Id.* at (2). This provision further provides that the Comptroller must notify the subject person at the time he issues the certificate. *Id.* at (3). If, following the issuance of a certificate pursuant to § 86, the subject individual leaves or tries to leave Singapore without paying the taxes, he "shall be guilty of an offence and may be arrested, without warrant, by any police officer or immigration officer." *Id.* at (5).

Thus, according to the plain language of the Income Tax Act, nonpayment of taxes, standing alone, does not carry a penalty of imprisonment. Arrest and imprisonment only come into play once the Comptroller issues a certificate pursuant to § 86 or if someone tries to leave Singapore following the issuance of such a certificate. Shah expressly testified that, to his knowledge, a certificate pursuant to § 86 has not been issued, and no one has directly threatened him with arrest or imprisonment. No evidence was presented suggesting that the Comptroller believes or has reason to believe that Shah intends to leave. And Shah has offered no evidence to suggest he is in any imminent and concrete danger of arrest or imprisonment. Any claim, therefore, that he faces such injuries is

7

speculative. So, without the "certain and immediate" threat of imminent imprisonment, *D.T.*, 942 F.3d at 327, this dispute centers on money—which does not rise to the level of irreparable harm. *Bertec Corp. v. Sparta Software Corp.*, No. 2:19-CV-04623, 2019 WL 7249259, at *6 (S.D. Ohio Dec. 27, 2019). These facts undermine any argument for certain or immediate irreparable harm.

Shah also claims he suffers irreparable harm for not being able to physically attend his sister-in-law's funeral (he attended virtually instead) or visit his father. He cites no case holding that the inability to physically visit relatives constitutes irreparable harm. Much less when that restriction is based on an otherwise legitimate and uncontested outstanding debt, regardless of who is ultimately liable to pay it. Closer scrutiny, however, shows that even these obstacles are financial ones. The payment of the outstanding tax will presumably lift any travel restrictions he faces.

Because Shah cannot demonstrate irreparable harm, the Court need not analyze the remaining factors. *D.T.*, 942 F.3d at 327; *Becerra*, 2022 WL 413680, at *5. Shah's motion for temporary restraining order is **DENIED**.

**IT IS SO ORDERED.**

                                              UNITED STATES DISTRICT COURT
                                              SOUTHERN DISTRICT OF OHIO

                              By: _____
                                     JUDGE MATTHEW W. McFARLAND