**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| NILESH SHAH, | : | |
| *Plaintiff*, | : | Case No. 1:22-cv-312 |
| v. | : | Judge Jeffery P. Hopkins |
| FORTIVE CORPORATION, *et al.*, | : | |
| *Defendants*. | : | |

## OPINION AND ORDER

After an extensive round of briefing and oral argument, we come to the decision point on the parties' cross-motions for summary judgment in this most contentious employment dispute. On June 2, 2022, Nilesh Shah ("Plaintiff" or "Mr. Shah") filed suit against Defendants Fortive Corporation, Advanced Sterilization Products, Inc., and Advanced Sterilization Products Services, Inc. (collectively, "Defendants" or "the Company")[1] alleging, among other claims, the breach of agreements to pay Mr. Shah's Singapore tax liabilities incurred during his employment. Defendants vehemently disagreed. From there, the litigation unfolded. Along the way, the parties have sparred over numerous discovery disputes, a motion for preliminary injunction and temporary restraining order, motions to strike expert testimony and affidavits, and both sides have pressed their positions through lengthy oral

[1] Defendants Fortive Corporation, Advanced Sterilization Products, Inc., and Advanced Sterilization Products Services, Inc. are collectively referred to as "Defendants" in this Opinion and Order. Separately, Fortive Corporation is referred to as "Fortive"; Advanced Sterilization Products, Inc. as "ASP"; and Advanced Sterilization Products Services, Inc. as "ASPS." Defendants ASP and ASPS are both wholly owned subsidiaries of Defendant Fortive. *See* Am. Compl., Doc. 37, ¶ 8; Ds. Ex. 2, Doc. 83-2, ¶ 1; Ivankovich Decl., Doc. 75, ¶ 2.

arguments and hearings.[2] We now arrive at summary judgment, where the principal question is whether Defendants agreed to pay Mr. Shah's Singapore tax liabilities. That question, and the remaining disputes, are now before the Court on cross-motions filed by the parties. Docs. 77, 83. In the end, Mr. Shah cannot sustain either his § 1981 discrimination claim or his breach of contract claim for unused paid time off ("PTO"). But whether Defendants agreed to pay his Singapore tax liabilities remains for a jury to decide.

Accordingly, and based upon the reasons provided below, Defendants' Motion for Summary Judgment (Doc. 83) is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiff's Motion for Partial Summary Judgment (Doc. 77) is **DENIED**. The Court will set this matter for telephonic conference by separate entry.

## I. FACTUAL BACKGROUND

Mr. Shah was born in India and became a naturalized United States citizen in 2001. Am. Compl., Doc. 37, ¶ 10. From May 2012 to 2019, Mr. Shah worked for GE Healthcare and was assigned to work out of Singapore. Shah Dep., Doc. 78, 25:13–18. However, in early 2019, Mr. Shah was recruited to become Vice President of International Sales & Service for Defendants based out of Singapore.[3] Ivankovich Decl., Doc. 75, ¶¶ 5, 7. Mr. Shah's 2019 offer

---

[2] The Court heard oral argument in this matter on April 22, 2026, and took the parties' motions for summary judgment under advisement. Notation Order, 4/22/26.

[3] In a footnote, Defendants contend that Fortive and ASPS should be dismissed from the action because Mr. Shah testified that ASP was his "only employer." *See* Doc. 83, PageID 1926 n.3 ("Plaintiff testified that his only employer was ASP . . . He offers no basis for suing the other entities. The other two Defendants should be dismissed with prejudice for that reason."). But Defendants' assertion that Mr. Shah identified ASP as his "only employer" is not supported by the cited deposition testimony. Mr. Shah's testimony was that he was "employed by AS[P]," which he understood to be "owned by Fortive Corporation." Shah Dep., Doc. 78, 10:18–24. Defendants offer no developed argument explaining why that testimony eliminates Fortive or ASPS from Mr. Shah's suit. Indeed, the Sixth Circuit has instructed district courts to "withhold judgment on issues not fully developed by the briefs or in the record," explaining that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Popovich v. Cuyahoga Cnty. Ct. of Common Pleas*, 276 F.3d 808, 823 (6th Cir. 2002) (quoting *McPherson v. Kelsey*, 125 F.3d

letter set out his compensation and benefits as an employee for Defendants. One provision of the letter, critical to this litigation pertaining to Mr. Shah's Singapore expat allowances, states the following, in relevant part:

> **Singapore Expat Allowances:** . . . The company will also pay for tax assistance while on assignment in Singapore which includes Singapore tax obligations and tax filing assistance in Singapore.

Am. Compl., Doc. 37, Pl. Ex. A., PageID 486. That provision is the foundation of Mr. Shah's principal claim in this litigation. Notably, however, toward the bottom of the letter, a second provision provided that the offer letter was "expressly conditioned [upon Mr. Shah's] execution and return of the . . . Repayment Agreements" and that Mr. Shah needed to "confirm [his] acceptance of th[e] offer by signing th[e] letter and all attached documents where indicated through DocuSign." *Id.* In addition to Mr. Shah's signature, the actual Repayment Agreement stated that it had to be "received by [Defendants'] local Human Resources Department before any actions with respect to relocation w[ould] be initiated." Zerm Aff., Doc. 80-7, Ds. Ex. 7, PageID 1629. But for whatever reason, Mr. Shah never received nor signed any Repayment Agreements. *See* Zerm Aff., Doc. 80, ¶ 11.

Dominic Ivankovich ("Mr. Ivankovich"), ASP's then-President; Aliza Scott ("Ms. Scott"), Defendants' then-VP of Human Resources; Pat Byrne, Fortive's then-Executive Vice President; and Mr. Shah discussed the terms of Mr. Shah's 2019 offer letter. *See* Ivankovich Decl., Doc. 75, ¶ 6; Scott Decl., Doc. 76, ¶ 3. Regarding these negotiations, Mr. Ivankovich later provided testimony that he and the other named senior leaders negotiated the tax assistance provision personally with Mr. Shah to ensure that he would not be placed in a

---

989, 995–96 (6th Cir.1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation omitted). The Court therefore declines to dismiss either entity on an argument Defendants have left undeveloped.

worse position financially by virtue of working in Singapore, and that the "agreed-upon tax terms" were drafted in order to protect Mr. Shah from double taxation on his income. Ivankovich Decl., Doc. 75, ¶¶ 8, 10. Adding to the narrative, Ms. Scott's testimony in her declaration went further to state that "as part of [Mr. Shah's] compensation," an agreement was made that "ASP would pay the income taxes [Mr. Shah] would owe to Singapore, while [Mr. Shah] would be responsible for paying the income taxes he would owe to the U.S." Scott Decl., Doc. 76, ¶ 5. However, Defendants later submitted a second declaration from Mr. Ivankovich stating that, at that time, "there was no intent, per the offer letter or otherwise, for [Mr.] Shah to receive a tax windfall by virtue of his employment with ASP." Ivankovich Decl., Doc. 94-2, ¶ 9.

Following these discussions, Mr. Shah accepted Defendants' at-will offer of employment on March 8, 2019, and began work thereafter (around May 2019) reporting directly to then-Fortive President, Mr. lvankovich. Zerm Decl., Doc. 80-2, Ex. 2, PageID 1475–77; Am. Compl., Doc. 37, ¶ 12; Pl. Ex. 1, Doc. 91-1, PageID 2945. Upon the start of Mr. Shah's employment, he also received the ASP Employee Handbook, which included another important provision as to PTO. That provision stated the following, in relevant part:

> In any situation when an employee is no longer with the company, paid time off such as Vacation, Sick, and Personal Holiday, are not an accrued benefit and are *not paid out upon termination*, except where required by applicable state law.

Ds. Ex. 6, Doc. 80-6, PageID 1511 (emphasis added). Shortly thereafter, on October 11, 2019, Mr. Shah received an email from the Director of Global Total Rewards, Michelle Verret-Sullivan ("Ms. Verret-Sullivan"), which provided that as part of Mr. Shah's expat assignment, he would "receive tax assistance" and that the Company's tax firm, KPMG, would support Mr. Shah with those services. Imm Decl., Doc. 74, PageID 953. Ms. Verret-Sullivan then

connected Mr. Shah with Tom Fuhrman from KPMG who was instructed to contact Mr. Shah with further details. *Id*. Upon the conclusion of his first year working for Defendants in 2019, Mr. Shah received a positive performance review from Mr. lvankovich, scoring a 3.6 out of 5.0 for his final overall performance rating that year. Pl. Ex. 1, Doc. 91-1, PageID 2958.

In 2020, Mr. Shah continued his role as Vice President of International Sales & Service and continued to receive favorable performance reviews, scoring a 3.4 out of 5.0 in his final performance review for 2020. *See* Pl. Ex. 1, Doc. 91-2, PageID 2973. However, in that review, Mr. Ivankovich noted that Mr. Shah could improve on how he handles frustration when "people let him down" and recommended that he find "a path to working those types of issues constructively (vs sometimes very aggressively)." *Id.* at PageID 2974. One other event from 2020 bears noting: Defendants paid Mr. Shah's Singapore taxes for the year. *See* Doc. 22, 160:15–18; Doc. 104, PageID 3226 n.3.

Then came 2021. Mr. Shah's role with the Company expanded that year. Defendants promoted him from Vice President of International Sales & Service to Vice President of Global Commercial, effective July 5, 2021. Am. Compl., Doc. 37, Pl. Ex. B, PageID 488. Because of his promotion, Mr. Shah's salary increased from $353,000 to $385,000 annually. *Id*. at PageID 485–90. Importantly, his 2021 promotional offer repeated, almost verbatim, the tax-assistance language from the 2019 offer letter, which stated the following in relevant part:

> **Singapore Expat Allowances:** . . . The company will also *continue* to pay for tax assistance while on assignment in Singapore which includes Singapore tax obligations and tax filing assistance in Singapore.

*Id.* (emphasis added). For the 2021 promotional offer letter, the only documents identified as conditions of Mr. Shah's continued employment were the offer letter itself and the Company's Agreement Regarding Competition and the Protection of Proprietary Interests, which

governed Mr. Shah's confidentiality obligations, protection of Defendants' proprietary interests, and certain restrictive covenants. *Id.* at PageID 489. Mr. Shah signed the promotional offer on May 4, 2021, and signed the Competition Agreement on April 7, 2021, along with Fortive Corporation's then-Vice President of Human Resources, Amanda Lynn. *Id.* at PageID 490; Ds. Ex. 1, Doc. 80-1, PageID 1472. That same year, Defendants allocated $6,340 for KPMG, the Company's tax preparation firm, to provide tax-related support to Mr. Shah during his time in Singapore. Ds. Ex. 4, Doc. 80-4, PageID 1484; Doc. 83, PageID 1924.

Later that year, Aisha Barry ("Ms. Barry") became Mr. Shah's new supervisor. He reported to her from July 2021 until his termination in March 2022. Barry Decl., Doc. 81, ¶ 2. Mr. Shah alleges that Ms. Barry treated him differently after she became his supervisor. Shah Dep., Doc. 90-1, 281:1–13; 283:1–20. According to Mr. Shah, Ms. Barry publicly criticized him, prevented him from responding while co-workers commented about one of his presentations, told him to "shut up and sit down," and seated him apart from other leaders at an important meeting. *Id.* at 289: 2–25. He further testified that Ms. Barry expressed jealousy about his compensation and expatriate assignment and told him that he was "living a good life for being an Indian." *Id.*

Ms. Barry completed Mr. Shah's 2021 appraisal. Pl. Ex. 3, Doc. 91-3, PageID 2976–82. The appraisal, however, reflects both praise and concern. In the review, Ms. Barry credited Mr. Shah's international success and identified his leadership strengths and stated that Mr. Shah had the potential to become a "leader among leaders." *Id.* at PageID 2982. But she also criticized his North American performance, financial growth, and problem-solving skills. *Id.* at PageID 2979, 2980, 2982. In the review, Mr. Shah received an overall rating of 2.5 out of 5.0 (his lowest rating since starting his employment). *Id.* at PageID 2982.

In late February 2022, one of Mr. Shah's direct reports made a complaint about his workplace behavior. Zerm Aff., Doc. 80-5, PageID 1490. In response, the Company retained the law firm, Sidley Austin, LLP ("Sidley Austin"), to investigate Mr. Shah's conduct. *Id.* The investigation concerned three questions, including (1) whether Mr. Shah's communications and actions toward other members of the team were abusive; (2) whether Mr. Shah acted in an abrasive and abrupt manner toward other managers and employees; and (3) whether Mr. Shah directed unprofessional, belittling or threatening conduct toward female employees more often or with greater intensity than male employees. *Id.*

But before Sidley Austin completed its report, on March 4, 2022, Mr. Shah sat down for a meeting with Ms. Barry regarding his conduct and performance. Barry Decl., Ex. 1, Doc. 81-1. Following the meeting, Mr. Shah sent Ms. Barry an email committing to "improve on some of [his] development areas," by communicating with greater care and respect toward his peers, using more positive reinforcement, and addressing his blind spots. *Id.* A week later, on March 11, 2022, Sidley Austin released its investigation report, which substantiated only one of the three alleged allegations. The report concluded that Mr. Shah often acted in an abrasive and abrupt manner toward employees and managers. Zerm Aff., Doc. 80-5, PageID 1490. Ms. Barry terminated Mr. Shah from the Company five days later—on March 16, 2022. Barry Decl., Doc. 81, ¶ 13. He was replaced by Chad Rohrer, a Caucasian employee. Barry Dep., Doc. 79, 83:4–10; 105:10–20.

## II. PROCEDURAL BACKGROUND

Mr. Shah filed suit against Defendants on June 2, 2022. Compl., Doc. 1. Shortly thereafter, Plaintiff moved for a preliminary injunction and temporary restraining order against Defendants seeking to require Defendants to pay his Singapore tax obligations. Docs.

6, 14. The Court held an evidentiary hearing on the matter on June 16, 2022. Notation Order, 6/17/22. At that hearing, Ms. Barry testified about the circumstances surrounding Mr. Shah's termination from the Company. Doc. 22, 143: 8–25. She stated that Mr. Shah's North American business was underperforming and that she had concerns about his conduct toward colleagues. *Id*. She also testified that she was aware of *two* investigations concerning Mr. Shah during his employment. *Id*. Following the hearing, this Court denied Mr. Shah's motion for injunctive relief.[4] *See* Doc. 14.

On July 14, 2022, Defendants moved to dismiss Plaintiff's Complaint. That motion was granted in part and denied in part. Docs. 19, 26. Mr. Shah subsequently filed an Amended Complaint on July 24, 2024. Am. Compl., Doc. 37. In the Amended Complaint, Mr. Shah asserts three claims against Defendants: (1) breach of contract based on the 2019 and 2021 offer letters for failing to pay his Singapore taxes;[5] (2) race, ethnicity, and/or color discrimination under 42 U.S.C. § 1981; and (3) breach of contract based on unused PTO. *Id.* at PageID 474–83.

On January 14, 2026, the parties filed cross-motions for summary judgment. Docs. 77, 83. Plaintiff moved for partial summary judgment on only Count I, his breach-of-contract claim concerning Defendants' alleged obligation to pay his Singapore taxes. Doc. 77. Mr. Shah argued that the 2019 and 2021 offer letters constituted valid and enforceable contracts; that their tax-assistance language required Defendants to pay his Singapore tax obligations;

---

[4] The Honorable Judge Matthew W. McFarland issued the Order Denying Motion for Temporary Restraining Order on June 17, 2022. *See* Doc. 14. Thereafter, the case was reassigned to the Undersigned for all further proceedings on December 21, 2022, by then-Chief Judge Algenon L. Marbley. *See* Doc. 24.

[5] In the Amended Complaint, Mr. Shah also alleges that Defendants failed to pay his Singapore tax obligations for income earned during the portion of 2022 in which he remained employed by Defendants. But Mr. Shah's briefing focuses on his claimed 2019 and 2021 tax obligations and does not further develop a separate argument for his 2022 taxes. *See* Am. Compl., Doc. 37, ¶ 21.

and that Defendants breached that obligation by failing to pay those taxes. *Id.* Defendants opposed the motion, arguing principally that the offer letters were superseded or limited by the parties' later Competition Agreement, that any obligation under the offer letters was subject to unsatisfied conditions due to Mr. Shah's failure to sign the Repayment Agreements, and that the relevant language in the offer letters required only tax-preparation assistance rather than payment of Mr. Shah's tax liabilities. Doc. 95.

Defendants separately moved for summary judgment on all of Mr. Shah's remaining claims. Doc. 83. As to Count I, Defendants advanced the same core arguments. However, Defendants further argued that Plaintiff could not establish breach or damages. Doc. 83, PageID 1934. As to the § 1981 claim, Defendants argued that they terminated Mr. Shah because of his documented North American performance concerns and conduct concerns, including the finding from the Sidley Austin investigation and report. *Id.* at 1936–40. Mr. Shah responded arguing that Defendants' explanation has shifted over time, that his favorable performance history and the positive portions of his 2021 appraisal undermine the asserted rationale, that the Sidley Austin investigation substantiated only limited conduct concerns, and that Ms. Barry's alleged comments and treatment toward him evidenced unlawful racial discrimination. Doc. 96, PageID 3107–3111. As to the unused PTO claim, Defendants contend that the Company's policy unambiguously foreclosed payment for unused PTO upon termination. Doc. 83, PageID 1940. Mr. Shah disagreed. Doc. 96, PageID 3111. The parties' motions are now fully briefed and ripe for decision.

## III. STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The movant "'always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

The non-movant cannot defeat summary judgment merely by pointing to any factual dispute. Indeed, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A fact is *material* if its resolution affects the outcome of an action, and a dispute is *genuine* if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At bottom, the Court must determine whether there is some "sufficient disagreement" that necessitates submitting the matter to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52).

Furthermore, as here, when parties file cross motions for summary judgment, "[e]ach party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that he or she is entitled to judgment as a matter of law." *Fed. Energy Regul. Comm'n v. Coaltrain Energy, L.P.*, 501 F. Supp. 3d 503, 522 (S. D. Ohio 2020).

"The fact that one party fails to satisfy that burden on his or her own Rule 56 motion does not automatically indicate that the opposing party or parties has satisfied the burden and should be granted summary judgment on the other motion." *Id.*

## IV. LAW AND ANALYSIS

Mr. Shah asserts three claims in his Amended Complaint. Am. Compl., Doc. 37. First, for breach of contract arising from the parties' 2019 and 2021 offer letters; second, for discrimination under 42 U.S.C. § 1981; and third, for breach of contract based on unused PTO. Defendants seek summary judgment as to each claim. Because Mr. Shah's partial motion for summary judgment overlaps with the issues raised in Defendants' motion, the Court addresses them together as to Count I of the Amended Complaint.

### A. Mr. Shah's Breach of Contract Claim (Count I)

*1. The 2019 and 2021 Offer Letters Are Enforceable Agreements,*[6] *the Competition Agreement Did Not Supersede the Offer Letters, and the Competition Agreement Is Not Mr. Shah's Governing Employment Contract*

The parties first dispute which of two documents governed their employment relationship. This question is one for the Court to decide under Ohio law.[7] *Savedoff v. Access*

---

[6] Mr. Shah and Defendants agree on the starting point: the parties entered into a valid employment contract. It is undisputed that Mr. Shah was offered employment, accepted that offer, and provided consideration through his labor. Thus, Mr. Shah had an enforceable contract with Defendants, which could be terminated for any reason not contrary to law. *Burrows v. Fuyao Glass Am. Inc.*, No. 3:17-cv-00186-TMR, 2017 WL 6262189, at *5 (S.D. Ohio Dec. 8, 2017) ("An employee's performance of job duties in exchange for benefits and compensation constitutes consideration.") (citing *Russell v. GTE Gov't Sys. Corp.*, 232 F. Supp. 2d 840, 853 (S.D. Ohio 2002)). However, the parties' agreement on any of the facts ends there.

[7] This Court sits in diversity. As a result, under the *Erie* doctrine, the Court must apply the substantive law of the state where it is located. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009); *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). Here, the offer letters of employment provided by Mr. Shah contain no choice-of-law provision and instead state that Mr. Shah's position with the company is based in Cincinnati, Ohio. Am. Compl., Doc. 37, Pl. Exs. A–B, PageID 485–90.The Competition Agreement (Ds. Ex. 1, Doc. 80-1, PageID 1464–72) provided by Defendants, by contrast, provides that the agreement "shall be governed by and construed in accordance with the laws of the State of Washington, without applying its conflict-of-laws principles." In the ordinary course, the Court would apply conflict-of-law rules to decide whether the Competition Agreement's forum-selection provisions

*Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) ("Under Ohio law, the interpretation of written contract terms, . . . is a matter of law for initial determination by the court."); *Hartke v. Advent Servs, LLC*, No. 3:23-cv-301, 2025 WL 2043675, at *7 (S.D. Ohio July 21, 2025) ("A determination of the scope of the agreements is a preliminary question that a court must determine."); *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 647 (6th Cir. 1991) (applying Ohio law). The Court addresses each argument in turn.

Start with Defendants. They contend that Mr. Shah's employment was exclusively governed by the terms and conditions outlined in the parties' Agreement Regarding Competition and Protection of Proprietary Interests (the "Competition Agreement") signed on April 7, 2021, by Mr. Shah and Fortive Corporation's then-Vice President of Human Resources, Amanda Lynn. *See* Ds. Ex. 1, Doc. 80-1, PageID 1464–1472. The agreement's title (which, notably, is bolded and capitalized) and its text, makes evident that the purpose of the agreement is to require all employees to protect the Company's confidential information that the employees may have had access to during the duration of their employment with Defendants. *Id.* The Competition Agreement further requires the signing employee to acknowledge that it will "learn and have access to the Company's confidential,

---

should be enforced. That inquiry is unnecessary here. First, Defendants acknowledge that, to the extent it applies, Washington law accords with Ohio law. Doc. 83, PageID 1928 n.5; Doc. 95, PageID 3068 n.3. Importantly, a choice-of-law analysis is unnecessary where the potentially applicable states would apply the same rule of law or reach the same result. *McCruter v. Travelers Home & Marine Ins. Co.*, 2021-Ohio-472, ¶ 47 (11th Dist.) (citing *Akro-Plastics v. Drake Indus.*, 115 Ohio App.3d 221, 224 (11th Dist. 1996)); *Mecanique C.N.C., Inc. v. Durr Envtl., Inc.*, 304 F. Supp. 2d 971, 975 (S.D. Ohio 2004) ("If the two states would use the same rule of law or would otherwise reach the same result, it is unnecessary to make a choice of law determination because there is no conflict of law."). In any regard, both parties cite Ohio law in their summary judgment papers, and doing so, waived any application of Washington law in this matter. *See, e.g.*, *Atlas Indus. Contractors, LLC v. In2Gro Techs.*, No. 2:19-cv-2705, 2021 WL 1139887, at *4–5 (S.D. Ohio Mar. 25, 2021) (finding that the parties waived application of choice of law provision in contract where they failed to address it or explain the difference between the chosen law and the law of the forum). Accordingly, the Court will apply Ohio law in this Opinion and Order.

trade secret, and proprietary information . . . and [understands that the] promises in th[e] Agreement are an important way for the Company to protect its *proprietary interests*." *Id*. at PageID 1464 (emphasis added). Because the Competition Agreement—which Defendants identify as Mr. Shah's employment agreement—"contains no reference to any tax at all," Defendants contend that Mr. Shah's employment contract did not require payment of his Singapore taxes. Doc. 83, PageID 1927.

Mr. Shah takes the opposite view. He maintains that his offer letters became the parties' employment agreements when he accepted Defendants' offers and assumed the roles of Vice President of International Sales & Service in 2019 and Vice President of Global Commercial in 2021. Am. Compl., Doc. 37, Pl. Ex. B, PageID 485–90; Doc. 77, PageID 1000. Mr. Shah also notes that the offer letters speak directly to the issue at the center of this litigation: Defendants alleged obligations to pay his Singapore tax liabilities, while the Competition Agreement does not. *Id*. at PageID 1002; *see* Am. Compl., Doc. 37, Pl. Ex. A., PageID 486 ("The company will also pay for tax assistance while on assignment in Singapore which includes Singapore tax obligations and tax filing assistance in Singapore.").

The Court agrees. First, Mr. Shah received his offer letter for the position of Vice President of International Sales & Service from Defendants on February 18, 2019. *Id*. He accepted Defendants' job offer on March 8, 2019, and thereafter began work (around May 2019). *Id*. at PageID 487; Am. Compl., Doc. 37, ¶ 12. On the other hand, Mr. Shah did not sign the Competition Agreement—the agreement Defendants would have the Court treat as his employment agreement—until April 7, 2021, more than *two years* after Mr. Shah's employment began. Ds. Ex. 1, Doc. 80-1, PageID 1472. Thus, the 2021 Competition

Agreement, as a practical matter, could not and did not govern Mr. Shah's employment when he joined the Company in 2019.

Defendants, however, argue that Mr. Shah's 2019 and 2021 offers are not binding because they were integrated into the Competition Agreement by way of the agreement's merger clause. Doc. 83, PageID 1922. Not so. As the Ohio Supreme Court put it, "[c]ontract integration provides that where the parties' intent is sought to be ascertained from several writings, a prior writing will be rejected in favor of a subsequent one if the latter writing contains the whole of the parties' agreement." *Trinova Corp. v. Pilkington Bros., P.L.C.*, 70 Ohio St.3d 271, 275 (1994). And "[w]hile the presence of a merger clause . . . may provide some evidence that the parties intended the contract to cover the full extent of the agreement, it is not dispositive." *Hartke*, 2025 WL 2043675, at *7 n.2; *Pilkington Bros., P.L.C.*, 70 Ohio St.3d at 276 ("Integration is a rule of substantive law to be decided by the trial judge in the first instance.").

Paragraph seventeen of the Competition Agreement provides the following, in relevant part:

> **Amendment, Waiver, Severability, and Merger**. If I executed other written agreements *relating to this subject matter* with the Company, and/or if I later enter into other written agreements that contain provisions *similar* to the provisions contained in this Agreement, all such provisions shall be interpreted to provide the Company with cumulative rights . . .

Ds. Ex. 1, Doc. 80-1, PageID 1468–69 (emphasis added).

Importantly, the Court "cannot read [an] integration clause in isolation but must read it in context." *Vail v. String*, 2019-Ohio-984, ¶ 35 (8th Dist.). Here, the clause is clearly "limited in subject matter." *Id.* ¶ 33. Although both the Competition Agreement and offer letters relate to Mr. Shah's employment broadly, the provisions of the Competition Agreement are

concerned solely with the theme of protection of the Company's proprietary interests and confidential information as opposed to Mr. Shah's basic employment terms such as his position, salary, bonuses, office location or tax-related information, which are discussed in great detail in the offer letters. *Id.* (finding that an integration clause did not evidence an intent to supersede or modify a preexisting agreement because it was "limited in subject matter"); *Hartke*, 2025 WL 2043675, at *7 ("Where the prior agreement's subject matter is sufficiently different from the subsequent agreement to the point where the parties would naturally omit it, the prior agreement remains enforceable."); *Try Hours, Inc. v. Douville,* 2013-Ohio-53, ¶¶ 14, 15 (6th Dist.) (stating that the integration clause did not apply because the subject matter of the second agreement was "expressly limited in scope"). Therefore, the concept of integration is not applicable here and Mr. Shah's offer letters did not merge with the Competition Agreement.

Turning more broadly to the language of the Competition Agreement, as noted, its provisions are concerned entirely with the protection of company interests: confidentiality, non-competition, non-solicitation of customers and employees, return of company property, non-disparagement, and more similar restrictive covenants. Ds. Ex. 1, Doc. 80-1, PageID 1464–72.These are all familiar protections an employer uses to safeguard its confidential information and proprietary interests. But that agreement says nothing about Mr. Shah's employment duties; does not specify his salary, bonuses, commissions, equity, or benefits; or even mention Mr. Shah's location of work (domestic or Singapore). *Hopkins v. U.S. Bancorp*, No. 1:16-cv-552, 2017 WL 3537181, at *2 (S.D. Ohio Aug. 17, 2017) ("[T]here was no agreement as to the exact wage Plaintiff would be paid, the most *essential term* of an

employment contract.") (emphasis added). The Competition Agreement does not even identify Mr. Shah's position with the Company.

On the other hand, the 2019 and 2021 offer letters address many of these subjects, including Mr. Shah's base salary for his positions as Vice President of International Sales and later (after his promotion) to VP of Global Commercial, his eligibility for benefits, details regarding the company's sales commission program, and specifically mentions Mr. Shah's placement in Singapore and the "tax assistance" and "tax obligations" language most relevant to this litigation. Am. Compl., Pl. Exs. A–B. Doc. 37, PageID 485–90 ("The company will also pay for tax assistance while on assignment in Singapore which includes Singapore tax obligations and tax filing assistance in Singapore."). Therefore, the Court declines to treat the Competition Agreement as the agreement governing *all* aspects of Mr. Shah's employment. Unlike the offer letters, the Competition Agreement fails to set forth the basic terms and conditions of Mr. Shah's employment, and says nothing of his salary, bonuses, commissions, equity, or benefits, and duties and responsibilities, which are each essential considerations of *any* employment contract, especially one of a high-level executive. For the reasons stated above, the Court concludes that the 2019 and 2021 offer letters are enforceable agreements (hereinafter, the "Employment Contracts"), that the Competition Agreement did not supersede them, and that the Competition Agreement is not Mr. Shah's governing employment agreement with Defendants.

*2. The Competition Agreement's Survival Clause Is Inapplicable*[8]

Defendants' next argument is also unpersuasive. The parties' Competition Agreement contains a survival clause under paragraph twenty. That clause provides that the restrictions and covenants in that agreement would remain binding following Mr. Shah's termination. Ds. Ex. 1, Doc. 80-1, PageID 1472. Because the Employment Contracts do not include a similar survival clause, Defendants contend that the operative language contained in the Employment Contracts, namely the terms allegedly calling for the payment of Singapore taxes at issue in this dispute, no longer apply. Doc. 83, PageID 1928. The Court disagrees. Paragraph twenty of the Competition Agreement, provides, in relevant part, as follows:

> **Obligations Survive Termination**. I acknowledge and agree that the restrictions and covenants *set forth in this Agreement* shall be binding upon me and survive termination of my employment or relationship with the Company regardless of the reason(s) for such termination.

Ds. Ex. 1, Doc. 80-1, PageID 1469. Importantly, "[t]he intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med Life Ins. Co.*, 31 Ohio St.3d 130, 132 (1987); *Mike McGarry & Sons, Inc. v. Constr. Res. One, LLC*, 2018-Ohio-528, ¶ 94 (6th Dist.) ("[C]ourts will not, in effect, create a new contract by finding an intent not expressed in the clear language employed by the parties."); *Savedoff*, 524 F.3d at 764 (same); *Symyx Techs., Inc. v. Stargate Mobile L.L.C.*, No. 06-12632, 2006 WL 2943301, at *2 (E.D. Mich. Oct. 13, 2006) ("It would be a strained reading of the agreement to suggest

---

[8] Defendants separately contend that any obligation to pay Mr. Shah's taxes ended when his employment terminated in 2022 based upon the "while on assignment in Singapore" language in the Employment Contracts. Doc. 104, PageID 3225 ("During his employment [Mr. Shah] never demanded any tax payment from Defendants, and including for his 2019 taxes."); Am. Compl., Pl. Exs. A–B. Doc. 37, PageID 485–90. But the Sixth Circuit has held unequivocally that "[m]ere termination or expiration of an agreement alone does not automatically terminate obligations already accrued." *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 888 (6th Cir. 2023).

that these provisions do not survive termination merely because the agreement did not specifically designate them as surviving.").

Simply put, because there is a survival provision in the Competition Agreement, it does not necessarily render every obligation contained in a separate agreement (*i.e.*, the Employment Contracts) signed earlier by the parties, automatically terminated unless accompanied by a similar survival clause. The only fair reading of the 2019 and 2021 Employment Contracts is that the provisions which address Mr. Shah's base salary, his positions as an executive, his benefits, and sales commissions, and importantly for purposes of resolving this dispute, Mr. Shah's placement in Singapore and the "tax assistance" and "tax obligations" language, survived and continued to formulate part of the employment agreements. Am. Compl., Pl. Exs. A–B. Doc. 37, PageID 485–90.

*3. There Is a Genuine Dispute as to the Issue of Waiver*

Defendants next contend that even if Mr. Shah's offer letters became contracts, the agreements were "expressly conditioned [upon Mr. Shah's] execution and return of the . . . Repayment Agreements" which he failed to sign, making any agreement unenforceable. Am. Compl., Doc. 37, Pl. Ex. A., PageID 486; Doc. 83, PageID 1928; Doc. 104, PageID 3224. Mr. Shah disagrees. He states that Defendants accepted the benefits of his performance for years as he worked as Vice President of International Sales and later as Vice President of Global Commercial and cannot now claim that the agreements were never binding. Doc. 96, PageID 3099–3100. Indeed, Mr. Shah's 2019 employment agreement was conditioned upon his return of several documents, including the "Repayment Agreements." Am. Compl., Doc. 37, Pl. Ex. A., PageID 486.

Under Ohio law, "[a] 'condition precedent' is one that is to be performed *before* the agreement becomes effective," and which "calls for the happening of some event or the performance of some act . . . before the contract shall be binding on the parties."[9] *Mumaw v. W. & S. Life Ins. Co.*, 97 Ohio St.1, 11 (1917); *Ohio Nat'l Life Assur. Corp. v. Satterfield*, 2011-Ohio-2116, ¶ 5 (9th Dist.) ("A condition precedent is 'an act or event, other than a lapse of time, which must exist or occur before a duty of immediate performance of a promise arises.'") (citations omitted); *Webb v. Pewano, Ltd.*, 2009-Ohio-2629, ¶ 15 (12th Dist.) ("If a condition precedent is not fulfilled, the parties are excused from performing under the contract."); *see also Carter v. New Buckeye Redev. Corp.*, No. 72501, 1998 WL 158855, at *3 (8th Dist. Apr. 2, 1998) (stating that "[a] condition subsequent occurs when a contract was formed, but the parties agree that if certain contingencies occur, the contract will no longer be in effect").

This general rule, however, is subject to the longstanding doctrine of waiver. "A waiver is an intentional relinquishment of a known right; it may be made by express words or by conduct." *Corey v. Big Run Indus. Park, L.L.C.*, 2009-Ohio-5129, ¶ 17 (10th Dist.); *WSB Rehab. Servs., Inc. v. Cent. Acct. Sys., Inc.*, 2022-Ohio-2160, ¶ 28 (1st Dist.). Importantly, the party alleging waiver, in this case, Mr. Shah, "must prove a clear, unequivocal, decisive act of the party against whom the waiver is asserted, showing such a purpose or acts amounting to an estoppel on his part." *Father & Son Prop. Maint., LLC v. Maxim Ents., Inc.*, 2011-Ohio-689, ¶ 21 (5th Dist.) (citation omitted). Whether a party waived any provision of a prior written

---

[99] The Court in *Powell* adopted the view that a contract may exist even where performance remains subject to an unfulfilled condition precedent. *See Powell v. CBRE, Inc.*, No. 1:22-cv-496, 2026 WL 2164399, at *6 (S.D. Ohio July 28, 2026). In that circumstance, the condition affects the parties' duties to perform, not necessarily the validity or formation of the agreement.

agreement is a factual question for the trier of fact. *Palek Corp. v. A.P. O'Horo Co.*, 2007-Ohio-1121, ¶ 27 (7th Dist.) (citation omitted). Ohio courts have found that a party waives a condition precedent when it continues to perform under the contract despite the other party's failure to satisfy that condition. *See Corey*, 2009-Ohio-5129, ¶ 23.

In this case, there is a genuine dispute as to whether Defendants waived the signature requirement. There is no dispute that Mr. Shah's 2019 employment agreement was expressly conditioned upon his execution and return of the Repayment Agreements. Am. Compl., Doc. 37, Pl. Ex. A., PageID 486. In addition, the Repayment Agreements required a signature by Mr. Shah and had to be "received by [Defendants'] local Human Resources Department before any actions with respect to relocation w[ould] be initiated." Zerm Aff., Doc. 80-7, Ds. Ex. 7, PageID 1629. Mr. Shah never signed the Repayment Agreements nor returned a signed copy to his human resources office. *See* Zerm Aff., Doc. 80, ¶ 11.

However, despite Mr. Shah's failure to sign, he began working out of Singapore in 2019 in the position of Vice President of International Sales and Service. Zerm Decl., Doc. 80-2, Ex. 2, PageID 1475–77. Defendants then promoted Mr. Shah in 2021 to Vice President of Global Commercial and increased his annual salary from $353,000 to $385,000—nearly $400,000 annually and also paid his Singapore income taxes for 2020. *See* Am. Compl., Pl. Exs. A–B. Doc. 37, PageID 485–90; Doc. 22, 160:15–18; Doc. 104, PageID 3226 n.3. Beyond that, Mr. Shah's 2021 promotion letter does not state that Mr. Shah's promotion, continued employment, or compensation depended on his signing the Repayment Agreements. *See* Am. Compl., Doc. 37, Pl. Ex. B, PageID 488–90.

If the signature requirement was truly essential to Mr. Shah's employment, a jury could determine that Defendants would not have promoted him without requiring the

signature to be provided from the years 2019 to 2022. *See Carter-Jones Lumber Co. v. Colabianchi Constr., Inc.*, 2025-Ohio-1601, ¶ 18 (11th Dist.) (stating that the parties waived the signature requirement in the subcontractor agreement because their performance expressed an intent to be bound by the terms of the agreement despite the agent's failure to sign); *City of St. Marys v. Auglaize Cty. Bd. of Commrs.*, 2006-Ohio-1773, ¶ 31, *aff'd*, 2007-Ohio-5026 ("The parties performed under the contract for twelve years; any condition precedent was waived due to this extended performance, and the County cannot now assert the failure of the condition as excusing its performance obligations."); *Amicus Miami of Ohio, LLC v. Kacachos,* No. 1:22-cv-00355, 2025 WL 2687592, at *11 (S.D. Ohio Sept. 19, 2025) (stating that while certain agreements were not finalized, both parties evidenced an intention be bound, which waived the condition precedent).

Based upon the evidence provided here at summary judgment, a jury could find that Defendants waived the condition precedent requirement for Mr. Shah to sign the Repayment Agreements though hiring, assigning, compensating, and promoting Mr. Shah despite his failure to sign the Repayment Agreements.

*4. There Is a Genuine Dispute as to Whether Defendants Agreed to Pay Mr. Shah's 2019 and 2021 Singapore Taxes Based Upon the Language of the Contracts*

That brings us to Defendants' next argument. They contend that the words "tax assistance" as written in the 2019 and 2021 Employment Contracts do not support the assertion that Defendants are liable for Mr. Shah's Singapore taxes for either year. Doc. 83, PageID 1930–31. Mr. Shah disagrees. He argues instead that the term "obligation" in the agreements require Defendants "not only to provide assistance with tax filing, but also to pay Mr. Shah's Singapore tax obligations." Doc. 96, PageID 3101–02. To start this discussion,

we turn to the Ohio appeals court opinion in *Sunoco* which describes the Court's role when interpreting a contract:

> When confronted with an issue of contract interpretation, our role is to give effect to the intent of the parties. We will examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. In addition, we will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11.

*Sunoco, Inc. (R & M) v. Toledo Edison Co*., 2011-Ohio-2720, ¶ 37.

Here, the operative language in the Employment Contracts is ambiguous. *Savedoff*, 524 F.3d at 763 ("Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court."). Recall that the Employment Contracts state, in relevant part, that the "company will also pay for *tax assistance* while on assignment in Singapore which includes Singapore *tax obligations* and tax filing assistance in Singapore." Am. Compl., Pl. Exs. A–B. Doc. 37, PageID 485–90 (emphasis added). Here, Defendants hang their argument on the term "tax *assistance*." Doc. 83, PageID 1931 (emphasis added). Specifically, they note that the *Merriam-Webster* definition of "assist" and "assistance" means to help or provide aid. *Id*. Based on that alleged ordinary meaning, Defendants contend that the Employment Contracts required them only to *help* Mr. Shah with his Singapore tax obligations, not to pay those obligations. Doc. 83, PageID 1930–31. The Court agrees that the term "assistance" means to help and, indeed, according to *Merriam-Webster* the term "assist" means to "to give usually *supplementary* support or aid to." *See Assist*, Merriam-Webster, https://www.merriam-webster.com/dictionary/assist (last visited Aug. 18, 2026) (emphasis added).

But grammar supplies another clue. Here, again, we start with the language of the agreement: "The company will also pay for *tax assistance*." Am. Compl., Doc. 37, Pl. Ex. A., PageID 486 (emphasis added). Here, a jury could read the term "tax assistance" as completing the verb phrase "will also pay for" and thus identifying what the Company agreed to pay. *Id*. And the rest of the sentence can be read as explaining what that assistance includes. The language, "which includes Singapore *tax obligations* and tax filing assistance in Singapore" points back to the term "tax assistance." *Id* (emphasis added). That clause then lists two items joined by "and": "Singapore tax obligations" and "tax filing assistance in Singapore." *Id*. Read in parallel, tax assistance can mean merely *help* or support with Mr. Shah's Singapore tax obligations as opposed to payment of the obligations themselves. However, the term "tax assistance" is not the only relevant language in the Singapore Expat Allowances clause of the Employment Contracts, even though Defendants would have us read that term in isolation.

Importantly, "[o]ne of the cardinal principles of contract construction is to give reasonable effect to *every provision* in the agreement."[10] *Stone v. Nat'l City Bank*, 106 Ohio App.3d 212, 221 (8th Dist. 1995) (emphasis added); *Foster Wheeler Enviresponse v. Franklin Cty.*

[10] Defendants separately assert that Mr. Shah attempts to rely on hearsay statements made by his tax advisor, Thomas Fuhrman, and others at KPMG to support his claims. Doc. 83, PageID 1933. Under Evidence Rule 801, "[h]earsay is when a party offers an out-of-court statement for its truth." *Garrett v. Sw. Med. Clini*c, 631 F. App'x 351, 358 (6th Cir. 2015). To be specific, the term "hearsay" means that "(1) the declarant does not make [the statement] while testifying at the current trial or hearing; and (2) a party offers [the statement] in evidence to prove the truth of the matter asserted in the statement." *See* Fed. R. Evid. 801(c). Of course, "[h]earsay evidence may not be considered on summary judgment" and must be disregarded. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp*., 176 F.3d 921, 927 (6th Cir. 1999); *Berry v. Frank's Auto Body Carstar, Inc.*, 817 F. Supp. 2d 1037, 1041 (S.D. Ohio 2011), *aff'd*, 495 F. App'x 623 (6th Cir. 2012). However, because Mr. Shah did not respond to this argument at summary judgment, he has not shown that Fuhrman's or KPMG's statements could be presented in an admissible form. The burden was his to meet. *See* Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."). The Court therefore declines to consider the statements at the summary-judgment stage.

*Convention Facilities Auth.*, 78 Ohio St.3d 353, 363 (1997) ("In construing [an] agreement, [the court] must attempt to give effect to each and every part of it . . . and avoid any interpretation of one part which will annul another part."); *Eastham v. Chesapeake Appalachia, LLC*, No. 2:12-cv-0615, 2013 WL 5274576, at *3 (S.D. Ohio Sept. 18, 2013), *aff'd*, 754 F.3d 356 (6th Cir. 2014) ("A court interpreting a contract must also give effect, if possible, to all of the words used; if one construction would make a particular term meaningless and it is possible to construe the term in such a way as to give it meaning and purpose, the latter must control.").

*Merriam-Webster* defines the term "obligation" as "an amount owed" or a commitment "to pay a particular sum of money." *See Obligation,* Merriam-Webster, https://www.merriam-webster.com/dictionary/obligation (last visited Aug. 21, 2026). The word *obligation* does important work here. Read together and in context, "pay for tax assistance . . . which includes Singapore tax obligations and tax filing assistance" is reasonably susceptible to an interpretation that "tax obligations" refers to the taxes owed on Mr. Shah's income and that the company agreed to pay those as part of his compensation. Am. Compl., Pl. Exs. A–B. Doc. 37, PageID 485–90. Here, ultimately, the contractual language is "susceptible of two or more reasonable interpretations" and that ambiguity is apparent on "the face" of the agreements. *Savedoff*, 524 F.3d at 763 (citation omitted).

Importantly, when a contract bears more than one reasonable interpretation, as is the case here, extrinsic evidence may be considered. *Savedoff*, 524 F.3d at 763 ("Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning.") (citation omitted); *Nighswander v. Waterstone LSP, LLC*, 2022-Ohio-971, ¶ 39 (6th Dist.) ("When a term in a contract is found to be ambiguous, a court may consider extrinsic evidence

to ascertain the intent of the parties and the meaning of the term."). Here, extrinsic evidence does not resolve the ambiguity. It emphasizes it. The evidence in the case supports competing, reasonable accounts of what the parties intended the Singapore expat allowances provision to cover in Mr. Shah's 2019 and 2021 Employment Contracts.

For example, Mr. Ivankovich provided testimony that he and other senior leaders negotiated the tax assistance provisions personally with Mr. Shah to ensure that he would not be placed in a worse position financially by virtue of working in Singapore, and that the "agreed-upon tax terms" were drafted in order to protect Mr. Shah from double taxation on his income. Ivankovich Decl., Doc. 75, ¶¶ 8, 10. Ms. Scott's testimony in her declaration went further to state that "as part of [Mr. Shah's] compensation," an agreement was made that "ASP would pay the income taxes [Mr. Shah] would owe to Singapore, while [Mr. Shah] would be responsible for paying the income taxes he would owe to the U.S." Scott Decl., Doc. 76, ¶ 5. Mr. Shah asserts that his attorneys have reviewed all of the documents produced to him by Defendants in this litigation and "[n]ot a single one of those documents contain any language regarding the payment of employee taxes that is identical or similar to the language contained in Defendants' 2019 and 2021 Offer Letters to Mr. Shah," which suggests that the tax language at issue here was specifically negotiated for Mr. Shah. Imm Decl., Doc. 74, ¶¶ 8–12. This coupled with the fact that Defendants *paid* all of Mr. Shah's 2020 Singapore taxes, a fact which neither party disputed, makes Mr. Shah's interpretation even stronger. *See* Doc. 22, 160:15–18; Doc. 104, PageID 3226 n.3.

On the other hand, Defendants' evidence supports the opposite conclusion. Defendants' expert witness, Dr. Doron Narotzki, an associate professor of taxation and business law and director of the Master of Taxation Program at the University of Akron,

stated that the tax provisions in the Employment Contracts here failed to include the standard language employers typically use when offering tax equalization to an employee. Doc. 49, PageID 574 ("The 2019 and 2021 employment agreements do not include any of the defining elements of a tax equalization policy. Such features include, but are not limited to, hypothetical tax calculations, gross-up provisions, year-end reconciliations, and formal reimbursement mechanisms."). This supports the contention that there was no agreement to pay Mr. Shah's 2019 and 2021 Singapore taxes in the first place. In addition, the record shows that Defendants set aside $6,340 for Plaintiff's tax assistance and support for tax filing in 2021, which buttresses Defendants' contention that the Company only intended to provide tax *assistance* to Mr. Shah. Ds. Ex. 4, Doc. 80-4, PageID 1484; Doc. 83, PageID 1924.

Even more so, Mr. Ivankovich signed a second declaration stating that "there was no intent, per the offer letter or otherwise, for [Mr.] Shah to receive a tax windfall by virtue of his employment with ASP," causing further confusion in the matter. Ivankovich Decl., Doc. 94-2, ¶ 9. All this means today is that there is a "sufficient disagreement" that necessitates submitting to a jury the question of whether these facts show by a preponderance of the evidence that Defendants agreed to pay Mr. Shah's 2019 and 2021 Singapore taxes, or not. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52); *Jordan v. Howard*, 987 F.3d 537, 542 (6th Cir. 2021) ("A factual issue is genuinely in dispute if a reasonable factfinder could resolve it either way.").

*5. There Is a Genuine Dispute as to Mr. Shah's Damages*

That leaves just one issue remaining in the parties' breach-of-contract dispute: damages. "To establish a breach of contract, a plaintiff must show that a contract existed, the plaintiff performed, the defendant breached, and the plaintiff suffered damages." *Pavlovich v.*

*Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006). In order to survive summary judgment, however, Mr. Shah is required only to "present evidence of the existence of damages—not the specific method of calculation or amount of damages." *Heath Wallace D.D.S., LLC v. Kalniz, Choksey Dental-Ralston, Inc.*, 2013-Ohio-2944, ¶ 41 (6th Dist.); *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562 (1931) ("[T]here is a clear distinction between the measure of proof necessary to establish the fact that [the plaintiff] had sustained some damage and the measure of proof necessary to enable the jury to fix the amount.").

Though damages must be shown with "reasonable certainty," they need not be calculated with mathematical precision. *See D.A.N. Joint Venture III, L.P. v. Med-XS Sols., Inc.*, 2012-Ohio-980, ¶ 35 (11th Dist.); *Barker v. Jamison*, No. 92-A-1756, 1993 WL 489236, at *2 (11th Dist. Oct. 25, 1993); *Pennant Moldings, Inc. v. C & J Trucking Co.*, 11 Ohio App.3d 248, 252 (12th Dist. 1983). For example, take *McGinnis*. There, the defendants at summary judgment alleged that the plaintiff failed to provide any evidence to prove his damages. *McGinnis, Inc. v. Lawrence Econ. Dev. Corp.*, 2003-Ohio-6552, ¶ 34 (4th Dist.). The plaintiff identified only the injuries it claimed to have suffered, including lost business opportunities and the time and resources it spent pursuing a project for the defendants. *Id.* ¶ 35. The court held that this showing was enough to create a factual dispute as to damages, even though the plaintiff had not yet proved the specific amount of his loss. *Id.*

Defendants, however, argue that Mr. Shah's breach of contract claim fails because he did not produce his Singapore tax returns in discovery. Doc. 83, PageID 1934–36. They also point to Mr. Shah's statement during his deposition that he could not recollect the exact amounts allegedly owed by Defendants. *Id.*; Shah Dep., Doc. 78, 111:23–25; 112:1–11. And Defendants cite *Brock v. Servpro* in support of their arguments. *Brock v. Servpro*, 2022-Ohio-158

(12th Dist.). There, the plaintiff admitted as part of his deposition testimony that he "ha[d] not suffered any compensable damages at all." *Id.* ¶ 21. He further stated that "*nothing* that [the defendant] did or failed to do cost him *any* money." *Id.* (emphasis added); *see also Auto Indus. Supplier Emp. Stock Ownership Plan v. Ford Motor Co*., 435 F. App'x 430, 459 (6th Cir. 2011) (stating that plaintiff failed to show that "any damages component was reasonably related to a specific contractual payment obligation," and that plaintiff failed to prove it "had been damaged at all" which was fatal to its breach of contract claim); *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp*., 596 F.3d 357, 367 (6th Cir. 2010) (stating that the plaintiff failed to satisfy its burden when it repeatedly failed to disclose his *lost profits* calculation and shared only its *intent* to claim as damages "any future loss of business revenue that may become known through the course of discovery").

The facts before the Court are clearly distinguishable. Here, Mr. Shah has offered sufficient evidence to create a material dispute as to damages. First, in a January 13, 2026, declaration, Mr. Shah states that he paid $218,167.74 Singapore dollars in income taxes to the Singapore Inland Revenue Authority on income earned while working for Defendants in 2021 and 2022. Shah Decl., Doc. 73, ¶¶ 9, 11. As he puts it, that amount equated to approximately $158,092 U.S. dollars at the time. *Id*. He also states that he paid $81,486 U.S. dollars in Singapore income taxes on income earned from Defendants in 2019. *Id*. Importantly, Mr. Shah's declaration may be considered at summary judgment because it describes facts that would be admissible through his own testimony at trial. *See* Fed. R. Civ. P. 56(c)(4); *Lamb v. Kendrick*, 52 F.4th 286, 296 (6th Cir. 2022).

Beyond that, Mr. Shah provided his income tax bill from the Inland Revenue Authority of Singapore received on May 13, 2022, which showed that his tax balance assessed in May

2022 was $218,167.74. Pl. Exs. 1-3, Doc. 9. However, as Defendants assert, Mr. Shah has not filed a receipt of his payment of those tax returns yet, which creates a genuine dispute as to damages. Defendants may challenge the issue of damages at trial, but Mr. Shah does not need to eliminate every uncertainty in his damages calculation at summary judgment. Indeed, "the law permits some level of uncertainty to be resolved by the trier of fact," *Innovation Ventures, LLC v. Custom Nutrition Lab'ys, LLC*, 912 F.3d 316, 345 (6th Cir. 2018) (citation omitted).

In sum, although the Court resolved several threshold contractual issues as a matter of law, genuine disputes of material fact remain as to whether Defendants agreed to pay Mr. Shah's 2019 and 2021 Singapore taxes, the issue of waiver, and damages. Summary judgment is therefore inappropriate under Mr. Shah's breach of contract claim, Count I of the Amended Complaint.[11]

**B. Mr. Shah's § 1981 Discrimination Claim (Count II)**

Mr. Shah next claims race discrimination pursuant to 42 U.S.C. § 1981. Section 1981 prohibits intentional race discrimination in the making and enforcement of contracts, including in the employment context.[12] *See* 42 U.S.C. § 1981. Importantly, claims of race discrimination under § 1981 are evaluated under the same framework that governs Title VII

---

[11] Defendants separately argue that Mr. Shah cannot establish breach. Doc. 83, PageID 1934–36. But that argument rises and falls with whether Defendants were contractually obligated to pay the disputed taxes, an issue that, for the reasons explained, cannot be resolved at summary judgment.

[12] Section 1981 provides:

> (a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(a)-(b).

race-discrimination claims. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999); *Noble v. Brinker Int'l, Inc.*, 175 F. Supp. 2d 1027, 1041 (S.D. Ohio 2001) ("The elements of a prima facie case under § 1981 are the same for those in a Title VII action.").

Because Mr. Shah offers no direct evidence that Defendants terminated him because of race, the Court applies the familiar *McDonnell Douglas* framework. That framework requires Mr. Shah to first establish a prima facie case of discrimination. *Noble*, 175 F. Supp. 2d at 1036. To establish a prima facie case of race discrimination, Mr. Shah must demonstrate that he: (1) is a member of a protected class; (2) was discharged; (3) was qualified for his position; and (4) either was replaced by a person outside of the protected class or was treated differently than similarly situated non-protected employees. *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

If he does so, the burden shifts to Defendants to articulate some legitimate, nondiscriminatory reason for its actions. *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007). Then, if Defendants succeed, the burden shifts back once more to Mr. Shah to show that Defendants' proffered reasons were mere pretext for race discrimination. *Id.* at 515–16. As noted, Title VII and § 1981 travel the same familiar burden-shifting path outlined in *McDonnell Douglas*. But § 1981 imposes one additional requirement: Plaintiff must prove that race discrimination was a but-for cause of his termination. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020) (stating that a § 1981 "plaintiff bears the burden of showing that race was a but-for cause of its injury"). In other words, it is insufficient for race merely to have been one motivating consideration; Mr. Shah ultimately must prove that race was a determinative cause of his termination. That requirement runs through the entire claim, including the prima facie case and the pretext analysis. *Comcast Corp.*, 589 U.S. at 333;

*Williams v. United Dairy Farmers*, 20 F. Supp. 2d 1193, 1201 (S.D. Ohio 1998). For reasons that will be discussed below, Mr. Shah cannot overcome summary judgment as to Count II.

*1. Prima Facie Case*

Defendants do not meaningfully dispute that Mr. Shah can establish a prima facie case. As noted, Mr. Shah is a naturalized citizen of Indian heritage (a person of color); he was discharged from his VP of Global Commercial position; and he was replaced by Chad Rohrer, a Caucasian employee. Am. Compl., Doc. 37, ¶ 10; Barry Decl., Doc. 81, ¶ 13; Barry Dep., Doc. 79, 83:4–10; 105:10–20. Mr. Shah also has provided evidence that he was qualified for his position: He received above average performance evaluations in 2019 and 2020 and was promoted in March 2021. Pl. Ex. 1, Doc. 91-1, PageID 2958; Pl. Ex. 1, Doc. 91-2, PageID 2973; Am. Compl., Doc. 37, Pl. Ex. B, PageID 488.Thus, the Court concludes that Mr. Shah was qualified for his position. The burden therefore shifts to Defendants to provide a legitimate, nondiscriminatory reason for his termination.

*2. Legitimate, Nondiscriminatory Reasons*

Defendants have articulated legitimate, nondiscriminatory reasons for Mr. Shah's termination: his performance as the leader of Defendants' North American market (his largest market) and his alleged conduct toward coworkers, per the outcome of an investigation conducted by Sidley Austin. Pl. Ex. 3, Doc. 91-3, Zerm Aff., Doc. 80-5, PageID 1490.Because Defendants have articulated legitimate, nondiscriminatory reasons for the challenged employment decision, the burden shifts back to Mr. Shah to adduce evidence sufficient for a reasonable jury to conclude that those reasons were pretextual.

*3. Pretext*

With regard to the issue of pretext, Mr. Shah has failed to create a genuine dispute. Pretext can be established in three ways. The employee can show that the employer's proffered reason (1) "had no basis in fact," (2) "did not actually motivate the employer's action," or (3) was "insufficient to motivate the employer's action." *Okakpu-Mbah v. Postmaster Gen. of United States*, No. 21-2811, 2022 WL 3928534, at *3 (6th Cir. Aug. 31, 2022); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Here, to carry his burden at summary judgment, Mr. Shah must produce sufficient evidence from which a jury could reject Defendants' explanation for his termination. *Okakpu-Mbah*, 2022 WL 3928534, at *3. This is a commonsense inquiry. *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir. 2009).

First, Mr. Shah contends that Defendants' explanation as to his termination changed over time. Doc. 96, PageID 3108–3109. According to Mr. Shah, Ms. Barry provided no explanation at his termination meeting. *Id.* He notes that at the TRO hearing, Ms. Barry referred to his lagging North American performance and *two* (as opposed to one) investigations regarding his conduct, while her later declaration identified his North American underperformance and only *one* conduct-related investigation conducted by Sidley Austin. *Id*. During the TRO hearing, Ms. Barry stated the following:

> **Q** Yes. Let me ask you a bit about the code of conduct issues. Do you have knowledge concerning complaints made against Mr. Shah during his employment?
>
> **A** I do. We had complaints regarding [Mr. Shah] both from his peers as well as from his direct reports. [Mr. Shah] worked for me directly starting in July of 2021 and that ended with the termination that you discussed. During that time period, there were *two investigations* into Mr. Shah, and what I would say is that that is highly unusual.
>
> The first one was conducted -- I was not 100-percent in [the] role at that time, so that was not conducted as something that I was a part of. The second was conducted. We actually used an external counsel.

Doc. 22, 143: 16–25; 144: 1–8 (emphasis added); Barry Aff., Doc. 81, PageID 1634, ¶ 13.

Materially shifting explanations can support an inference of pretext. *Briggs v. Univ. of Cincinnati,* 11 F.4th 498, 513 (6th Cir. 2021) (citing *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996)). But no material shift occurred here. Defendants consistently identified the same concerns: North American performance and Mr. Shah's unprofessional conduct toward co-workers. Ms. Barry's reference to *two* investigations during the TRO hearing described the complaints of which she was aware; it did not identify both investigations as separate bases for Mr. Shah's ultimate termination. And Ms. Barry's later declaration identified the same performance concern and the conduct concern that Sidley Austin substantiated. Barry Aff., Doc. 81, PageID 1634, ¶ 13 ("Mr. Shah . . . was being terminated for two reasons: (1) the underperformance of his largest market, the United States, and (2) inappropriate behavior towards coworkers, substantiated per the Sidley Austin investigation.").

Even more, Defendants stated concerns about Mr. Shah's conduct and performance did not first appear during this litigation. Before his discharge, Ms. Barry had documented concerns with Mr. Shah's North American performance and leadership style, Mr. Shah had indeed acknowledged the feedback he had received about his poor communications and committed to "improve on some of [his] development areas," and Sidley Austin's investigation had substantiated that Mr. Shah exhibited abrasive and abrupt conduct toward colleagues. Pl. Ex. 3, Doc. 91-3, PageID 2979, 2980, 2982; Barry Decl., Ex. 1, Doc. 81-1; Zerm Aff., Doc. 80-5, PageID 1490. Beyond that, Mr. Shah's first manager, Mr. Ivankovich, raised some of the same concerns about Mr. Shah in his *2020 appraisal*—even before Ms. Barry became Mr. Shah's manager. Indeed, Mr. Ivankovich noted that Mr. Shah could improve on

how he handles frustration when "people let him down" and recommended that he find "a path to working those types of issues constructively (vs sometimes *very aggressively*)." Pl. Ex. 1, Doc. 91-2, PageID 2974 (emphasis added).

Mr. Shah cites to his strong 2019 and 2020 evaluations, his 2021 promotion and bonus, and favorable portions of his 2021 appraisal—including Ms. Barry's comments that he had met expectations in a difficult environment, was courageous and adaptable, and had the potential to become a "leader among leaders." Pl. Ex. 1, Doc. 91-1, PageID 2958; Pl. Ex. 1, Doc. 91-2, PageID 2973; Pl. Ex. 3, Doc. 91-3, PageID 2976–82. That evidence reflects that Mr. Shah has genuine leadership characteristics. It does not show that Ms. Barry's documented concerns about his performance in North America were false or that they did not lead to his termination. Indeed, a mixed appraisal does not create pretext merely because it contains both praise and criticism. *Becker v. Elmwood Loc. Sch. Dist.*, 519 F. App'x 339, 343–44 (6th Cir. 2013) ("Even if we discount the two reviews that Becker contends were set-ups, the evaluations are still mixed at best. And they are certainly not positive enough to erase Becker's troubled history. . . So these reviews do not demonstrate that the reason for Defendant's decision to not rehire Becker was pretextual."). Following from that, this Court's "aim is not to review bad business decisions, or question the soundness of an employer's judgment." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990). Rather, the Court's task is to determine whether the evidence would permit a finding that its stated reasons were pretextual and that race discrimination was a but-for cause of Mr. Shah's termination. It does not.

Finally, Mr. Shah relies on his testimony that Ms. Barry said he was "living a good life for being an Indian" and that she publicly belittled and treated him more harshly than his

non-Indian peers.[13] Shah Dep., Doc. 90-1, 281:1–13; 283:1–20; 289: 2–25. But Mr. Shah identifies no evidence connecting that comment to the Company's actual termination decision, the performance appraisal, the Sidley Austin investigation, or Ms. Barry's assessment of his North American performance. Indeed, the Sixth Circuit has held that "racially insensitive statements" can be "sufficient evidence of racial animus only if they [had] some connection to the decision to terminate" the employee. *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012). As a result, "'[i]solated and ambiguous' comments will not support a finding of discrimination." *Id.* at 596 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998)). Because no reasonable jury could find that Defendants' performance and conduct reasons were pretextual, Mr. Shah cannot prove that he would have remained employed but for his race. *Comcast Corp.*, 589 U.S. at 333–41. Thus, Defendants are entitled to summary judgment on this claim, Count II of the Amended Complaint.

### C. Mr. Shah's Breach of Contract for Unused PTO Claim (Count III)

What remains, then, is Plaintiff's PTO claim. As to that claim, Mr. Shah contends that Defendants were required to pay him unused PTO upon termination. Doc. 96, PageID 3111. Defendants disagree. In their view, the ASP Employee Handbook expressly precludes payout at termination. Doc. 83, PageID 1940. Under Ohio law, an employer may adopt a clear policy

---

[13] In the Amended Complaint, Mr. Shah also identifies two purported comparators in support of his § 1981 claim. Mr. Shah alleges, "[u]pon information and belief," that Defendants maintained a practice of "replacing non-white executives with Caucasian" employees. Am. Compl., Doc. 37, ¶ 35.Specifically, he alleges that Defendants terminated an African American female Vice President of Quality and an African American male Vice President of Research and Development, replacing each with a Caucasian male. *Id.* ¶¶ 36–37. But these allegations, standing alone, are insufficient to create a genuine dispute of material fact: Mr. Shah identifies no evidence supporting the allegations, does not establish that either executive was similarly situated to him in relevant respects, and does not explain the circumstances of their terminations or replacements. *See Robinson v. Quicken Loans, LLC*, No. 21-1392, 2022 WL 4234072, at *6 (6th Cir. Sept. 14, 2022) (finding that the plaintiff did not satisfy the similarly situated element where the plaintiff failed to identify a comparator accused of the same misdeeds).

providing that unused PTO is forfeited at resignation or termination. *See Bologa v. I.H.S. Inc.*, No. 19218, 1999 WL 293945, at *2 (9th Dist. Mar. 17, 1999); *Sexton v. Oak Ridge Treatment Ctr. Acquisition Corp.,* 2006-Ohio-3852, ¶ 11 (4th Dist.). The question is therefore contractual: whether the employer clearly reserved the right not to pay unused PTO when employment ends. Here, Mr. Shah has failed to adduce evidence that demonstrates a genuine issue of material fact on this point. The ASP Employee Handbook provides, in relevant part:

> In any situation when an employee is no longer with the company, paid time off such as Vacation, Sick, and Personal Holiday, are not an accrued benefit and are *not paid out upon termination*, except where required by applicable state law.

Ds. Ex. 6, Doc. 80-6, PageID 1511 (emphasis added). This policy is sufficiently clear. *Bologa*, 1999 WL 293945, at *2 (stating that the plain language of the policy precluded payout of PTO by stating that "PTO is not paid to employees at termination of employment regardless of the reasons for termination, unless otherwise required by state law"); *Sexton*, 2006-Ohio-3852, ¶ 12 (stating that Defendants were not required by law to give PTO when the handbook provided that "employees *will not be paid* PTO upon employment termination"). The ASP Employee Handbook unambiguously provides that Mr. Shah's unused PTO would not be paid at termination, and Ohio law permits that result. Thus, Defendants are entitled to summary judgment on Plaintiff's unused PTO claim, Count III of the Amended Complaint.

## V. CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (Doc. 83) is **GRANTED IN PART** and **DENIED IN PART** and Plaintiff's Motion for Partial Summary Judgment (Doc. 77) is **DENIED**. Defendants are entitled to summary judgment on Mr. Shah's § 1981 discrimination claim (Count II) and his claim for unused PTO (Count III). Because genuine disputes of material fact remain concerning the parties' agreements as to Mr.

Shah's 2019 and 2021 Singapore tax obligations, waiver of the Repayment Agreements, and Mr. Shah's alleged damages, neither party is entitled to summary judgment as to Mr. Shah's breach of contract claim (Count I) in the Amended Complaint. *See* Am. Compl., Doc. 37. The Court will set this matter for telephonic conference by separate entry.

**IT IS SO ORDERED.**

September 30, 2026

Jeffery P. Hopkins
United States District Judge